UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHNNY RAMOS,

    Petitioner,

v.

A. P. KANE, warden,

    Respondent.

No. C 06-1014 MHP (pr)

**ORDER DENYING HABEAS PETITION**

## INTRODUCTION

Johnny Ramos, an inmate formerly at the Correctional Training Facility in Soledad, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the court for consideration of the merits of the pro se habeas petition. For the reasons discussed below, the petition will be denied.

## BACKGROUND

Ramos was convicted in Santa Barbara County Superior Court of second degree murder and was found to have used a firearm in the offense. On May 23, 1989, he was sentenced to 17 years to life in prison. His habeas petition does not challenge his conviction but instead challenges an August 17, 2004 decision of the Board of Prison Terms, now known as the Board of Parole Hearings ("BPH"), that found him not suitable for parole. This was his second parole hearing, and was conducted at a time when he was 16 years into his 17-to-life sentence.

The BPH identified the circumstances of the commitment offense, Ramos' unstable social history, and Ramos' need for more self-help programming as the reasons for its decision that his release would pose an unreasonable risk of danger to society or threat to

1  public safety. The BPH also relied on the opposition to parole by the victim's next of kin and
2  the district attorney's office.
3       Ramos sought relief in the California courts. The Santa Barbara County Superior
4  Court denied his petition for writ of habeas corpus in a short, but reasoned, decision. The
5  California Court of Appeal summarily denied his petition for writ of habeas corpus and the
6  California Supreme Court summarily denied his petition for review.
7       Ramos then filed his federal petition for a writ of habeas corpus. The court found
8  cognizable his claims that (1) his right to due process was violated because the evidence was
9  insufficient to support the BPH's decision that he was unsuitable for parole and (2) the BPH's
10 decision violated his plea agreement. Ramos later dismissed his unexhausted claim that the
11 BPH's decision violated his plea agreement. Respondent filed an answer on the remaining
12 claim and Ramos filed a traverse.
13      The court earlier indicated that it intended to wait for guidance from the anticipated <u>en
14 banc</u> decision in <u>Hayward v. Marshall</u>, 512 F.3d 536 (9th Cir.), <u>reh'g en banc granted</u>, 527
15 F.3d 797 (9th Cir. 2008). Although much time has passed, <u>Hayward</u> remains pending in the
16 appellate court and it is unknown to this court when the decision will be released. The court
17 will proceed to decide the merits of the petition without the benefit of the <u>Hayward</u> decision.

18                              **JURISDICTION AND VENUE**
19      This court has subject matter jurisdiction over this habeas action for relief under 28
20 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged
21 action concerns the execution of the sentence of a prisoner housed at a prison in Monterey
22 County, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

23                                     **EXHAUSTION**
24      Prisoners in state custody who wish to challenge collaterally in federal habeas
25 proceedings either the fact or length of their confinement are required first to exhaust state
26 judicial remedies, either on direct appeal or through collateral proceedings, by presenting the
27 highest state court available with a fair opportunity to rule on the merits of each and every
28 claim they seek to raise in federal court. <u>See</u> 28 U.S.C. § 2254(b), (c). The parties do not

dispute that state court remedies were exhausted for the claims asserted in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000). Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole. See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

## DISCUSSION

A.   Due Process Requires That Some Evidence Support a Parole Denial

A California prisoner with a sentence of a term of years to life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability proceedings. See Sass, 461 F.3d at 1127-28; Board of Pardons v. Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1 (1979); Cal. Penal Code § 3041(b).

A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision. Sass, 461 F.3d at 1128-29 (adopting some evidence standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)). "To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the BPH. Sass, 461 F.3d at 1128 (quoting

1  Superintendent v. Hill, 472 U.S. at 455-56).  The "some evidence standard is minimal, and
2  assures that 'the record is not so devoid of evidence that the findings of the . . . board were
3  without support or otherwise arbitrary.'"  Id. at 1129 (quoting Superintendent v. Hill, 472
4  U.S. at 457).  The some evidence standard of Superintendent v. Hill is clearly established law
5  in the parole context for purposes of § 2254(d).  Sass, 461 F.3d at 1129.  As a matter of state
6  law, the parole authority's decision must also satisfy the "some evidence" standard of review.
7  See In re Lawrence, 44 Cal. 4th 1181, 1191 (Cal. 2008) (state court "standard of review
8  properly is characterized as whether 'some evidence' supports the conclusion that the inmate
9  is unsuitable for parole because he or she currently is dangerous").

10       Having determined that there is a due process right, and that some evidence is the
11 evidentiary standard for judicial review, the next step is to look to state law because that sets
12 the criteria to which the some evidence standard applies.  One must look to state law to
13 answer the question, "'some evidence' of what?"

14 B.     State Law Standards For Parole For Murderers In California

15       California uses indeterminate sentences for most non-capital murderers, with the term
16 being life imprisonment and parole eligibility after a certain minimum number of years.  A
17 first degree murder conviction yields a minimum term of 25 years to life and a second degree
18 murder conviction yields a minimum term of 15 years to life imprisonment.  See In re
19 Dannenberg, 34 Cal. 4th 1061, 1078 (Cal. 2005); Cal. Penal Code § 190.  The upshot of
20 California's parole scheme described below is that a release date normally must be set unless
21 various factors exist, but the "unless" qualifier is substantial.

22       A BPH panel meets with an inmate one year before the prisoner's minimum eligible
23 release date "and shall normally set a parole release date. . . . The release date shall be set in a
24 manner that will provide uniform terms for offenses of similar gravity and magnitude in
25 respect to their threat to the public, and that will comply with the sentencing rules that the
26 Judicial Council may issue and any sentencing information relevant to the setting of parole
27 release dates."  Cal. Penal Code § 3041(a).  Significantly, that statute also provides that the
28 panel "shall set a release date unless it determines that the gravity of the current convicted

offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal. Penal Code § 3041(b).

One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides:  "A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c).  A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d).  A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public."[1]  The regulation also provides that "[t]he panel shall first determine whether the life prisoner is suitable for release on parole.  Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. § 2402(a).  The panel may consider all relevant and reliable information available to it.  15 Cal. Code Regs. § 2402(b).

The regulations contain a matrix of suggested base terms for several categories of crimes.  See 15 Cal. Code Regs. § 2403.  For example, for second degree murders, the matrix of base terms ranges from the low of 15, 16, or 17 years to a high of 19, 20, or 21 years, depending on some of the facts of the crime.  The statutory scheme places individual suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to ensure term uniformity.  Dannenberg, 34 Cal. 4th at 1070-71.  Under state law, the matrix is not reached unless and until the prisoner is found suitable for parole.  Id. at 1070-71; 15 Cal. Code Regs. § 2403(a).

The "Penal Code and corresponding regulations establish that the fundamental consideration in parole decisions is public safety . . . [T]he core determination of 'public safety' under the statute and corresponding regulations involves an assessment of an inmate's current dangerousness."  Lawrence, 44 Cal. 4th at 1205 (emphasis in source).[2]

A critical issue in parole denial cases concerns the parole authority's use of evidence

5

1  about the murder that led to the conviction.  Three Ninth Circuit cases provide the guideposts
2  for applying the Superintendent v. Hill some evidence standard on this point: Biggs v.
3  Terhune, 334 F.3d 910 (9th Cir. 2003), Sass, 461 F.3d 1123, and Irons v. Carey, 505 F.3d
4  846 (9th Cir. 2007).[3]  Biggs explained that the value of the criminal offense fades over time
5  as a predictor of parole suitability:  "The Parole Board's decision is one of 'equity' and
6  requires a careful balancing and assessment of the factors considered. . . .  A continued
7  reliance in the future on an unchanging factor, the circumstance of the offense and conduct
8  prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system
9  and could result in a due process violation."  Biggs, 334 F.3d at 916-17.  Biggs upheld the
10 initial denial of a parole release date based solely on the nature of the crime and the
11 prisoner's conduct before incarceration, but cautioned that "[o]ver time . . ., should Biggs
12 continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a
13 parole date simply because of the nature of Biggs' offense and prior conduct would raise
14 serious questions involving his liberty interest in parole."  Id. at 916.  Next came Sass, which
15 criticized the Biggs statements as improper and beyond the scope of the dispute before the
16 court:  "Under AEDPA it is not our function to speculate about how future parole hearings
17 could proceed."  Sass, 461 F.3d at 1129.  Sass determined that the parole board is not
18 precluded from relying on unchanging factors such as the circumstances of the commitment
19 offense or the petitioner's pre-offense behavior in determining parole suitability.  See id.
20 (commitment offenses in combination with prior offenses provided some evidence to support
21 denial of parole at subsequent parole consideration hearing).  Sass also put to rest any idea
22 from Biggs that the commitment crime and pre-offense behavior only support the initial
23 denial of parole.  Irons determined that due process was not violated by the use of the
24 commitment offense and pre-offense criminality to deny parole for a prisoner 16 years into
25 his 17-to-life sentence.  Irons emphasized that all three cases (Irons, Sass and Biggs) in
26 which the court had "held that a parole board's decision to deem a prisoner unsuitable for
27 parole solely on the basis of his commitment offense comports with due process, the decision
28 was made before the inmate had served the minimum number of years required by his

6

sentence." Irons, 505 F.3d at 853. Interpreting this statement from Irons to suggest that the offense can only be relied on until the minimum number of years has been reached would suffer the same problem that Sass identified in Biggs: it is not the holding of the case. The dicta in Biggs and Irons are speculative and do not determine when a denial of parole based solely upon the commitment offense or pre-offense behavior violates due process. Neither logic nor Irons compel a decision that such reliance must cease when the prisoner reaches the minimum number of years in his sentence, such as the fifteenth year of a 15-to-life sentence.

The upshot of these three cases is that the BPH can look at immutable events, such as the nature of the conviction offense and pre-conviction criminality, to predict that the prisoner is not currently suitable for parole even after the initial denial (Sass), but the weight to be attributed to those immutable events should decrease over time as a predictor of future dangerousness as the years pass and the prisoner demonstrates favorable behavior (Biggs and Irons). Sass did not dispute the principle that, other things being equal, a murder committed 50 years ago is less probative of a prisoner's current dangerousness than one committed 10 years ago. Not only does the passage of time in prison count for something, exemplary behavior and rehabilitation in prison count for something according to Biggs and Irons. Superintendent v. Hill's standard might be quite low, but it does require that the decision not be arbitrary, and reliance on only the facts of the crime might eventually make for an arbitrary decision.[4]

C. Some Evidence Supports The BPH's Decision In Ramos' Case

1. BPH Decision

The BPH identified the circumstances of the commitment offense, Ramos' unstable social history, and Ramos' need for more self-help programming as the reasons for its decision that his release would pose an unreasonable risk of danger to society or threat to public safety. The BPH also relied on the opposition to parole by the victim's next of kin and the district attorney's office. In its decision, the BPH observed that Ramos had numerous positive attributes. He had no disciplinary write-ups while in prison. He had marketable skills to use if paroled, albeit no job. He had vocational training in upholstery and appliance

7

1  repair. He had a high school diploma. Nonetheless, the positive aspects of his behavior did
2  not outweigh the factors of unsuitability, in the BPH's view.

         a.        <u>Commitment Offense</u>

4      In finding Ramos unsuitable, the BPH stated that the commitment offense "is certainly
5  the primary reason for the denial, and the manner in which it was carried out." RT 42. "The
6  viciousness of this crime is one that certainly is of grave concern to the Panel." RT 43. The
7  motive was trivial or inexplicable, regardless of whether the killing was due to jealousy or
8  anger. RT 43.

9      Ramos shot and killed his wife on September 17, 1988, ending a marital argument that
10  followed a night of heavy drinking by Ramos. <u>See</u> Resp. Exh. B, reporter's transcript of
11  August 17, 2004 hearing ("RT"), at 10-13. Earlier in the evening, Ramos and his wife had
12  been dancing and consuming alcohol at La Cantina Bar in Santa Maria, California. Ramos
13  drank about a six-pack of beer and at least a dozen mixed drinks. Resp. Exh. C, p. 8. His
14  wife drove him home and he passed out in the truck. When he awoke, he was alone in the
15  truck parked outside his house. He became angry because his wife had taken the truck and
16  house keys. He found another key, drove to a convenience store, and called a local restaurant
17  in an unsuccessful search for his wife. He returned home and, while in the backyard
18  vomiting, heard the phone ring so he broke into the house to answer it. The caller was his
19  wife, and he told her to "'Get her butt home.'" RT 11. His wife was at a restaurant with
20  friends and told them, "'If you hear an ambulance it will be coming for me.'" RT 13. When
21  Ramos' wife came home, they began arguing – first in the bedroom and then in the living
22  room. He eventually shot her in the head with his 9 millimeter pistol. Ramos then called his
23  brother and told him he loved him and his parents. When Ramos' parents called back, Ramos
24  told them his wife was dead. RT 11-12. Ramos confessed to police that he killed his wife.
25  Resp. Exh. C, pp. 7-8. The cause of death was five gunshot wounds to the victim's head. <u>Id.</u>
26  at 5. She also had a contusion on her right clavicle area and a slight swelling to the left side
27  of her abdomen. <u>Id.</u>

8

### b. Unstable Social History

The BPH stated that it also relied on Ramos' unstable social history in denying him parole. RT 43. The BPH noted that, while some parts of his life reflected stability, such as his graduation from high school and long-term employment, other parts reflected instability. RT 43-44. He had drug use as a juvenile, continued alcohol use as an adult, and anger management problems that resulted in domestic violence against both his first wife and his second wife (i.e., the murder victim).

There was evidentiary support for the BPH's reliance on this factor, even if there was mixed evidence on it. On the positive side, Ramos had no convictions as an adult and had been employed at the same place for about eight years. On the negative side, he had used marijuana, cocaine, LSD, and methamphetamine mostly as a juvenile. In adulthood, he used only alcohol, and only once or twice a month, according to Ramos, RT 17, although he had consumed a very large quantity of alcohol on the night of the murder. He had engaged in domestic violence against both his first and second wives. See RT 28, 38-39. He admitted he had an anger management problem.

### c. Need For More Self-Help

The BPH made a finding that Ramos need to continue "participation in self-help to further delve into the causative factors for his participation in this life crime, as well as to continue to develop the skills that will allow him to remain clean and sober and to deal with the issues of anger that he has expressed he's had, and until further progress is made in these areas he continues to be unpredictable and a threat to others." RT 44-45; see also RT 48.

There was evidentiary support for this finding. Although Ramos had participated in various groups and workshops, he had participated in Alcoholics Anonymous for only four years and not since 1999. Ramos stated that he stopped going to AA when his yard was on lockdown, and since then had been reading a book about alcohol and drug addiction. RT 24. His psychological assessment from 1999 had been positive overall, but did note that "alcohol abuse presents a significant risk factor, which may be a precursor to violence for inmate Ramos and mandatory attendance at AA should be a contingency upon granting parole." RT

26. Ramos stated that he had been "clean and sober" since 1989. RT 27.  He believed he could find an AA meeting if paroled, but had not yet made any efforts to do so. RT 29. He stated that he disagreed with AA, and had sought out other means to deal with his alcohol abuse, but would go to AA if paroled.  See RT 37.

The BPH also noted that several of the victim's relatives and the district attorney opposed parole. See RT 20-21, 38-41.  They are allowed to speak and the BPH is allowed by state law to consider their input in making its decision.  The fact that relatives or the district attorney oppose parole is not inherently probative of Ramos' current danger.  However, their input sometimes does contain information that may be of value in the parole consideration. Here, for example, one of the relative's statements showed that Ramos' proposed residence was quite near the residence of the victim's next of kin, which apparently is not permitted by the parole authority.   Like many other things, the statements of the victim's relatives and the district attorney are but part of the overall picture that the BPH must evaluate.   The information from the victim's relatives led the BPH to recommend that Ramos make alternate parole plans. RT 46.  Specifically, the BPH did not think his plan to live with his mother would be acceptable because he would be too close to the victim's next of kin, who apparently were within walking distance of his mother's house; the law reportedly required there to be a sufficient distance between the parolee and the victim's next of kin. RT 40, 46.

2.     State Court Decision

The Santa Barbara County Superior Court rejected Ramos' habeas petition in a short, but reasoned, decision. Resp. Exh. E.  The superior court stated:

> [T]he BPH acted principally on the basis that the gravity of the offense weighed against a finding of suitability. This weighing process is an exercise of judgment within its discretion, although given the length of time, especially with applicable credits, that he has served on a second degree murder conviction, other factors must be considered. It appears that the Board gave additional weight to concern about petitioner's unstable social history as reflected in a history of domestic violence and uncertainty about the extent to which Mr. Ramos appreciated its causes, the existence of a significant history with alcohol that has been addressed since 1999 only by reading on his own, and plans for parole that would place him in close proximity with the family of his victim over their expressed objections. While, on the other hand, petitioner's discipline-free conduct and anger management course work, his job skills and his overall psychological assessment are strong positive factors favoring parole, the decision of the Board of Prison Terms, after weighing all of the factors, is not an abuse of its discretion. There is some evidence to support its decisions.

Resp. Exh. E, pp. 1-2.

### 3. Analysis Of Federal Claim

This court applies § 2254(d) to the Santa Barbara County Superior Court's decision because it is the last reasoned decision from a state court on Ramos' claim. See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005). The superior court correctly identified the "some evidence" standard as the applicable standard for judicial review, as evidenced by its citation to In re Rosenkrantz, 29 Cal. 4th 616 (Cal. 2002), which had cited and adopted the Superintendent v. Hill some evidence standard as the proper standard for judicial review of evidentiary sufficiency for administrative cases. See Rosenkrantz, 29 Cal. 4th at 665-67.

The superior court did not unreasonably apply Superintendent v. Hill in determining that there were "strong positive factors favoring parole," Resp. Exh. E, p. 2, but they were outweighed by negative factors. Notwithstanding all the positive factors for Ramos, the BPH had determined that, 16 years into his 17-to-life sentence, Ramos posed an unreasonable risk of danger to society if released from prison because of the murder plus his history of domestic violence, plus uncertainty about his appreciation of the cause of his violence, plus the concerns about his limited work on his alcohol problem that required further self-help. There is a rational connection between the evidence relied on and the decision that he is a current threat. Shooting one's spouse in the head five times is cruel and callous. Although the murder was obviously a very large factor in its decision, the BPH did not rely solely on the murder and instead relied on the murder plus a combination of several other factors. Ramos had a history of domestic violence and a history of alcohol abuse before incarceration, which reasonably would prompt concern about a return to either if paroled. Added to this was the uncertainty caused by Ramos' cessation of participation in the Alcoholics Anonymous program five years before the hearing and replacement of that program with only reading a book, plus his inconsistent statements that he didn't believe in AA, but would attend meetings if paroled. The alcohol and anger management concerns that the BPH identified were important – even Ramos admits that the murder he committed was

the result of the "lethal combination of anger and alcohol." Traverse, p. 10.   Bearing in mind that the court's chore is to consider not whether some evidence supports the reasons, but whether some evidence supports the conclusion that Ramos' release unreasonably endangers public safety, this court concludes that the Santa Barbara County Superior Court's rejection of his insufficient evidence claim was not contrary to or an unreasonable application of the Superintendent v. Hill some evidence standard.  Ramos is not entitled to the writ.

## CONCLUSION

For the foregoing reasons, the petition is denied on the merits.  The clerk shall close the file.

IT IS SO ORDERED.

DATED: March 16, 2010

Marilyn Hall Patel
United States District Judge

# NOTES

1.      The listed circumstances tending to show <u>unsuitability</u> for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense; and negative institutional behavior.  15 Cal. Code Regs. § 2402(c).  The listed circumstances tending to show <u>suitability</u> for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior.  15 Cal. Code Regs. § 2402(d).

2.      The California Supreme Court's determination in <u>Lawrence</u>, 44 Cal. 4th 1181, that state law requires the parole authority to determine whether the inmate is unsuitable for parole because he currently is dangerous is binding in this federal habeas action.  <u>See</u> <u>Hicks v. Feiock</u>, 485 U.S. 624, 629-30 (1988).  However, <u>Lawrence</u> does not govern this court's analysis in every respect.  This court is not bound by the discussion in <u>Lawrence</u> (<u>see</u> footnote 4, <u>infra</u>) as to the evaluation of the commitment offense in determining whether the parole applicant currently is dangerous.  As to that point, <u>Lawrence</u> is persuasive authority, while the Ninth Circuit's holdings in <u>Sass</u>, <u>Biggs</u>, and <u>Irons</u> are binding authority. Also, <u>Lawrence</u>'s determination that "some evidence" is the proper standard of judicial review, 44 Cal. 4th at 1211-12, does not bind this court because it is a state court decision and, in any event, was not determining the standard required by the federal constitution.

3.      <u>En</u> <u>banc</u> review is now pending in a fourth case regarding the some evidence standard, <u>Hayward v. Marshall</u>, 512 F.3d 536 (9th Cir.), <u>reh'g en banc granted</u>, 527 F.3d 797 (9th Cir. 2008).  The order granting <u>en</u> <u>banc</u> review states that the panel opinion is of no precedential value.

4.      The California Supreme Court discussed the use of the commitment crime to deny parole in the companion cases of <u>Lawrence</u>, 44 Cal. 4th 1181, and <u>In re Shaputis</u>, 44 Cal. 4th 1241 (Cal. 2008).  The court explained that where "evidence of the inmate's rehabilitation and suitability for parole under the governing statutes and regulations is overwhelming, the only evidence related to unsuitability is the gravity of the commitment offense, and that offense is both temporally remote and mitigated by circumstances indicating the conduct is unlikely to recur, the immutable circumstance that the commitment offense involved aggravated conduct does not provide 'some evidence' <u>inevitably</u> supporting the ultimate decision that the inmate remains a threat to public safety."  <u>Lawrence</u>, 44 Cal. 4th at 1191 (emphasis in source).  Applying that rule, the court determined that there was not some evidence to deny parole in <u>Lawrence</u> but that there was some evidence to deny parole in <u>Shaputis</u>.